UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ASHLIE SIMONETTI,

                Plaintiff,        COMPLAINT

    - against -

FAIRSTEAD MANAGEMENT, LLC.       PLAINTIFF DEMANDS A
                                               TRIAL BY JURY

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Ashlie Simonetti, by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendant Fairstead Management, LLC, as follows:

### NATURE OF CLAIMS

        1.     Simonetti had a promising career with Fairstead until she announced that she was pregnant. Soon after her announcement, her manager gave her a critical review, the first negative review for Simonetti at Fairstead. Then, while Simonetti was on maternity leave, and trying to talk with Fairstead about extending her leave to care for her son's medical condition, Fairstead dismissed her. To make matters worse, Fairstead offered Simonetti far less than its usual severance and admitted it did so because of her maternity leave.

        2.     Plaintiff brings this action to remedy defendant's discriminatory and retaliatory treatment. Specifically, plaintiff brings this action to remedy gender discrimination, including pregnancy discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); discrimination on the basis of plaintiff's association with a disabled person in violation of Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); and gender discrimination, including pregnancy discrimination,

#1018290

discrimination on the basis of plaintiff's association with a disabled person, and retaliation in violation of New York State Human Rights Law, N.Y. Executive Law § 296 et seq. (the "State Law"); and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 et seq. (the "City Law").

3. Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, and appropriate legal and equitable relief.

## JURISDICTON AND VENUE

4. This Court has jurisdiction over plaintiff's Title VII and ADA claims under 28 U.S.C. § 1331. Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over plaintiff's State Law and City Law claims because these claims closely relate to the Title VII and ADA claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the defendant regularly does business in New York, New York and the acts of discrimination and retaliation occurred within the Southern District of New York.

## PROCEDURE

6. Pursuant to Section 8-502(c) of the New York City Human Rights Law, plaintiff will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

7. Plaintiff filed a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") against defendant on or about October 5, 2023. On August 11, 2025, the EEOC issued plaintiff a notice of right to sue.

PARTIES

8. Plaintiff is a woman who worked for defendant in its New York City office from 2019 until May 2023.

9. On information and belief, Fairstead is a limited liability corporation organized under the laws of the State of New York with offices in New York, New York.

FACTUAL ALLEGATIONS

Background

10. Simonett is an experienced marketing and communications professional.

11. Simonetti graduated cum laude from Baruch College with a bachelor's degree in Business Communication in 2021.

12. From 2007 to 2009, Simonetti worked in guest services for McKibbon Hospitality, a hotel management company operating hotels for brands including Marriott, Hilton, and Hyatt.

13. While in this role, Simonetti was nominated for Marriott's "Spirit to Serve" award.

14. In 2009, Simonetti was promoted to Assistant General Manager and helped to oversee several hotel renovations and opening.

15. Simonetti was the youngest Assistant General Manager in company history.

16. In this role, Simonetti consistently increased revenue and occupancy year over year for the properties for which she was responsible.

17. Simonetti was also nominated for a "Spirit of Homewood Suites" award in recognition of her excellent performance.

18. In 2010, Simonetti became a Task Force General Manager for properties in Florida and Alabama.

19. Simonetti's responsibilities included staff training and development; overseeing human resources matters, including hiring, assigning work, and providing coaching and performance appraisals; managing guest relations; and adhering to franchise and company procedures and regulations.

20. From 2014 to 2018, Simonetti worked in Sales, Service and Accounting for Rolex in New York City.

21. From 2018 to 2019, Simonetti worked as a Senior Executive Assistant for Geller and Company, a financial services and wealth management firm.

Plaintiff's Work At Fairstead

22. Fairstead is a national real estate development company headquartered in New York.

23. Fairstead has over 700 employees.

24. Fairstead was founded in 2014 and has since developed more than 170 properties in 28 states.

25. Simonetti joined Fairstead in 2019 as an Executive Assistant to one of the company's founders, Will Blodgett.

26. Simonetti's responsibilities as an Executive Assistant included organizing travel and logistics; coordinating meetings with potential buyers, sellers, brokers and other stakeholders; handling day-to-day operations and scheduling for Blodgett's team; and ensuring that his direct reports were on track to complete assignments.

27. Shortly after joining Fairstead, Simonetti suggested that Blodgett and she have regular informal check-ins to discuss her performance. His feedback in these meetings was consistently positive.

28. In the spring of 2020, Simonetti began taking courses at Baruch College.

29. In March 2021, Simonetti received her first formal performance review.

30. The review was overwhelmingly positive, and Fairstead gave Simonetti a 25% performance bonus.

31. Following Simonetti's review, she asked Blodgett what she could do to advance at the company long-term and mentioned that she was interested in marketing and communications.

32. At the time Simonetti joined Fairstead, the company did not have a marketing department.

33. In or around January 2021, Fairstead hired a Chief Communications Officer, Jessica Scaperotti.

34. Simonetti also met with Scaperotti in the spring of 2021 to discuss her career goals and mentioned to Scaperotti that she was taking college courses and interested in marketing.

35. Based on Simonetti's excellent performance and the company's growth, and on Simonetti's expressed interest in working in marketing, Blodgett and Scaperotti encouraged her to complete her college degree, which she did in 2021.

36. During the summer of 2021, Simonetti learned that Blodgett planned to leave Fairstead.

37. Fairstead CEO Jeffrey Goldberg told Simonetti that she was an "asset to the firm" and that leadership wanted to keep her at Fairstead after Blodgett's departure.

38. Scaperotti, who was in the process of building Fairstead's marketing department, also told Simonetti that she wanted to find a role for her on her team.

39. In November 2021, Fairstead promoted Simonetti to the role of Communications Associate in the Sales and Marketing department.

40. In this role, Simonetti reported to Vice President of Communications Jovana Rizzo.

41. As a Communications Associate, Simonetti supported company internal and external public affairs and marketing efforts for the firm's $6 billion real estate portfolio.

42. In addition to her new marketing responsibilities, Simonetti continued to provide some executive assistant services to company leadership.

43. Shortly after Simonetti's promotion, she organized Fairstead's participation, for the first time, in the annual Affordable Housing Finance ("AHF") conference.

44. The AHF conference is the premier conference serving affordable housing developers, owners, management firms, and state agencies, and represented an important opportunity for Fairstead to build relationships within the industry.

45. The conference was particularly important following the departure of Blodgett, who had previously personally managed many of the company's important client relationships.

46. After the conference, Goldberg emailed Simonetti, copying company leadership, complimenting her work and crediting her with helping the firm to close an important deal.

47. Simonetti received a second performance review in the spring of 2022, in which Scaperotti described her performance as excellent and specifically complimented her work on the AHF conference.

48. Scaperotti and Rizzo told Simonetti, in sum and substance, to "continue doing what you're doing," and suggested that she was likely be promoted in the future.

49. Two days later, Simonetti also met with Goldberg and Chief People Officer Stephanie Perez to discuss her performance. Goldberg informed Simonetti that she would receive a 20% bonus.

Fairstead Discriminates Against Plaintiff Based on Her Pregnancy

50. On or about July 5, 2022, Simonetti told Rizzo that she was pregnant and due the following February.

51. Shortly after Simonetti announced her pregnancy, Rizzo asked her to complete a mid-year self-evaluation of her performance, to which Rizzo would then respond.

52. A few days later, Rizzo responded to Simonetti's review and provided negative feedback on Simonetti's performance for the first time during Simonetti's employment.

53. Simonetti believed that this review did not accurately represent her performance at the company. She gathered documents including emails, logs, and direct messages showing that the negative feedback was inaccurate.

54. For example, Rizzo had stated that Simonetti was not sufficiently responsive and cited as evidence of this the fact that she had purportedly not responded for several days to an email Rizzo had sent her. In fact, Simonetti had responded to Rizzo appropriately promptly to the email in question, which was not even work-related. Rizzo had emailed Simonetti

7

after business hours on a Friday asking to use Simonetti's personal clothing steamer, and Simonetti responded to her first thing Monday morning.

55. Within a day of receiving her review, Simonetti contacted Perez and General Counsel Seth Hoffman to discuss her concerns about her performance review.

56. On or about July 20, Simonetti met with Perez and Hoffman and shared with them the documentation contradicting Rizzo's criticisms of her performance

57. Simonetti also said she believed that her performance review was unfair and inaccurate and that she was being discriminated and retaliated against based on her pregnancy and intention to take leave.

58. Perez told Simonetti that the company would investigate the matter.

59. On or about July 25, Perez told Simonetti that the company had completed its investigation and concluded that, as Simonetti had asserted, there were no grounds for her negative performance review.

60. As a result of this investigation, Fairstead gave Simonetti a new manager and began reporting to Christopher Manning, Vice President of Community Impact and Government Affairs.

61. Simonetti continued to work as a Communications Associate, but changed her focus to Government Affairs.

Plaintiff Takes Maternity Leave

62. Following her complaint, Simonetti continued to work and perform well throughout her pregnancy.

63. Simonetti did not miss a single day of work between August and December of 2022 and reported to the office more often than was required by the hybrid work policy in place at Fairstead at the time.

64. Manning, who had joined the company in March 2022, consistently gave Simonetti positive feedback on her work and told her that she was very helpful in acclimating him to the company.

65. On her doctor's recommendation, Simonetti began working completely remotely in January 2023 in order to reduce walking and standing due to her pregnancy, which was exacerbating side effects from a back surgery she had undergone in May 2022.

66. Several employees, including three members of the marketing team, worked fully remotely at the time for non-medical reasons.

67. Throughout the months of January and February Simonetti worked with her colleagues to complete or transition all of her ongoing projects in anticipation of her maternity leave.

68. Simonetti gave birth to her son on February 11, 2023.

69. Under the company's maternity leave policy, Simonetti expected to return to work on June 12, 2023.

Plaintiff Asks For Additional Leave

70. In the beginning of April 2023, while Simonetti was still on maternity leave, her son was diagnosed with a lip tie, tongue tie, and cheek tie and began seeing an occupational therapist to determine whether intervention or surgery would be required.

71. After several weeks of therapy, Simonetti's son's doctor told her that he would likely need to have surgery to address his issues and referred her to a specialist in another state.

72. The appointment with the specialist was scheduled for June 1, 2023. The specialist told Simonetti that, if she determined surgery was necessary, she could perform it the day of the initial appointment.

73. The recovery from the surgery was estimated to be three or four weeks.

74. Simonetti would also be required to take her son to several follow-up appointments with the out-of-state specialist.

75. On or about April 23, Simonetti contacted Benefits Coordinator Natalie Lopez and told her that she needed to discuss her options for extending my maternity leave, referring to potential options Lopez had mentioned in their initial discussions about her leave.

76. Simonetti was scheduled to speak with Lopez on April 27, 2023, but Lopez did not call at the scheduled time.

77. Lopez also did not respond when Simonetti contacted her to reschedule.

Fairstead Fires Plaintiff

78. On Sunday, April 30, 2023, Simonetti emailed Perez, copying Lopez, asking for a response to her request to meet and specifying that the purpose of the meeting was to discuss her maternity leave.

79. On May 3, 2023, Simonetti met with Lopez and People Partner Jessica Pereg via Microsoft Teams.

80. Pereg told Simonetti that she was being let go from the company and that her benefits for herself, her husband, and her son would end effective June 30, 2023.

81. Pereg also told Simonetti that Fairstead would offer her two weeks of severance.

82. Pereg stated that she had initiated the meeting in order to fire Simonetti, even though Simonetti had initiated the meeting to discuss extending her leave.

83. Simonetti expressed her surprise at being fired at the same time that she was seeking to take additional leave to care for her son.

84. On information and belief, the company typically offers employees at least three months of severance, including employees with significantly shorter tenures at Fairstead than Simonetti's.

85. When Simonetti asked Pereg why her severance offer was so low, Pereg told her that it was because she had taken maternity leave.

86. Fairstead later claimed that it laid Simonetti off because it dissolved the Marketing and Communications Department. However, Simonetti was not in that department any longer and reported to Manning, working on Government Affairs. Neither Manning nor the only other person reporting to him were laid off. Moreover, although Rizzo was part of the Marketing and Communications Department, she did not lose her job.

FIRST CAUSE OF ACTION
Title VII: Gender Discrimination

87. Plaintiff repeats and realleges paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender, including her pregnancy, in violation of Title VII.

89. Defendant has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights under Title VII.

90. As a result of defendant's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
### ADA Discrimination

91. Plaintiff repeats and realleges paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92. By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her association with a person with a disability in violation of the ADA.

93. Defendant has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights under the ADA.

94. As a result of defendant's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
### State Law: Discrimination

95. Plaintiff repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

96. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender, including her pregnancy, and on the basis of her association with a disabled person, in violation of the State Law.

97. Defendant has acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights under the State Law.

98. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

FOURTH CAUSE OF ACTION
City Law: Discrimination

99. Plaintiff repeats and realleges paragraphs 1 through 98 as if fully set forth herein.

100. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender, including her pregnancy, and on the basis of her association with a disabled person, in violation of the City Law.

101. Defendant engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

102. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

### FIFTH CAUSE OF ACTION
### Title VII: Retaliation

103. Plaintiff repeats and realleges paragraphs 1 through 102 as if fully set forth herein.

104. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to unlawful discrimination in violation of Title VII.

105. Defendant acted with malice and/or reckless indifference to plaintiff's statutorily protected rights under Title VII

106. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

### SIXTH CAUSE OF ACTION
### State Law: Retaliation

107. Plaintiff repeats and realleges paragraphs 1 through 106 as if fully set forth herein.

108. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to unlawful discrimination in violation of the State Law.

109. Defendant has acted intentionally and with malice or reckless indifference to plaintiff's statutorily protected rights under the State Law.

110. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

SEVENTH CAUSE OF ACTION
City Law: Retaliation

111. Plaintiff repeats and realleges paragraphs 1 through 110 as if fully set forth herein.

112. By the acts and practices described above, defendant retaliated against plaintiff for her opposition to unlawful discrimination in violation of the City Law.

113. Defendant engaged in retaliation with willful or wanton negligence, with recklessness, and/or conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

114. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a. declaring that the acts and practices complained of herein are in violation of the Title VII, the ADA, State Law, and the City Law;

b. enjoining and permanently restraining these violations;

c. directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

d. directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for defendant's discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

  e. directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

  f. directing defendant to pay plaintiff punitive damages;

  g. awarding plaintiff her reasonable attorneys' fees and costs;

  h. awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

  i. granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
   November 5, 2025

            VLADECK, RASKIN & CLARK, P.C.

          By: */s Anne L. Clark*
            Anne L. Clark
            Attorneys for Plaintiff
            111 Broadway, Suite 1505
            New York, New York 10006
            (212) 403-7300